UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC MCPHAIL | No. 14-CR-10201-DJC |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States respectfully submits this memorandum in support of its request that the Court sentence defendant Eric McPhail to 51 months' imprisonment, the bottom of the applicable Guidelines Sentencing Range.

Introduction and Background

Between July 2009 and April 2011, Eric McPhail was the linchpin of an insider trading scheme that netted its seven participants nearly $750,000 in illicit gains and avoided losses. Throughout that period, McPhail, an accomplished golfer at the Oakley Country Club in Watertown, Massachusetts, abused the trust of a fellow member, Angelo Santamaria, who was a senior executive at American Superconductor Corporation ("AMSC"). The two men were close friends, golfing together, socializing regularly, traveling together with their wives, and sharing many of the sensitive details of their personal and professional lives. It was a relationship that involved Santamaria quietly lending McPhail $6,000 to pay a bookie, McPhail refereeing marital disputes at Santamaria's home, and Santamaria's advice to McPhail on how to handle the ugly details of McPhail's divorce. McPhail texted Santamaria more than any other person except his

own wife. As the jury found, their relationship was one of trust and confidence –obligations McPhail understood fully.

Despite those obligations, McPhail listened carefully as he sat with Santamaria drinking beer, eating dinner, watching the Red Sox at Fenway Park, attending the Kentucky Derby, or visiting Las Vegas, and then – often immediately afterward – passed on the latest AMSC information to his buddies so they could trade. McPhail, as he conceded from the stand, never told Santamaria that he was tipping stock information to his friends. This was a willful betrayal of a close friendship.

Dozens of emails and trading records from nearly two years showed this to be an extended betrayal. And McPhail didn't just tip one person. He tipped at least seven, ranging from his closest friend since college (Jamie Meadows) to fellow golfers (*e.g*., Douglas Parigian) to a partner at a national law firm (Douglas Clapp). As summarized at paragraph 13 of the Pre-Sentence Report ("PSR"), McPhail made his friends a lot of money:

| **Name** | **Approximate Profit ($)** |
|---|---|
| John Drohen | 3,894 |
| Douglas Clapp | 6,856 |
| Andrew Drohen | 15,728 |
| John Gilmartin | 46,700 |
| David Brown | 180,907 |
| Jamie Meadows | 191,521 |
| Douglas Parigian | 301,341 |
| **Total** | **746,947** |

The emails admitted at trial painted a vivid picture of McPhail's conduct – and attitude – during the conspiracy. McPhail was cavalier about his betrayal and eager to impress his friends. For example:

> "Well boys … went to the Sox game with a friend of mine tonight. He seems to think that AMSC has a $100 million deal with China that should be signed very

2

shortly."  (The email continued with additional details, ending with "SSSSHHHHH.")[1]

or

"Ding ding ding … spent a lot of time with my boy.  Feb 4 and 40 kept coming up :)."[2]

*See PSR* ¶ 16.

At other times, McPhail expressly acknowledged that he was trafficking in inside information.  For example, on February 2, 2010, in an email to John Drohen, copying Parigian and others, McPhail wrote, "I can only get the inside info … can't control if it goes up or down."  Similarly, in an earlier email from Andrew Drohen to McPhail, dated July 28, 2009, Drohen asked McPhail, "What's the word on the inside for the drop [in AMSC's share price] today?"  *PSR* ¶ 17.

McPhail even took steps to make sure Santamaria didn't find out what he was doing: on September 30, 2009, in the course of emailing with Parigian, Andrew Drohen, and others, McPhail warned, "Remember, no AMSC comments on the other thread," a reference to a parallel email chain involving the same men that also included Stephen Kilcoyne, Santamaria's good friend and *not* one of McPhail's tippees.  *Id*.

The illegal activity culminated in early April 2011, when Santamaria found out that AMSC's loss of a major customer, once public, would wipe out his retirement savings.  Santamaria, distraught, confided in McPhail by email on March 31, 2011, and the next day at a pub in Waltham, Massachusetts.  McPhail, seeing the value of the information, didn't even wait to email his friends later.  Instead – while still at the pub with Santamaria – at 8:13 p.m. he called

---

[1] Email of September 29, 2009, McPhail to Parigian and Andrew Drohen.

[2] Email of November 29, 2009, McPhail to several tippees.

Parigian with the news. Parigian called his broker less than ten minutes later. Parigian and others made hundreds of thousands of dollars on McPhail's final tip, buying and selling put options on the news. *PSR* ¶ 25. McPhail, meanwhile, keeping an annual tradition, went to the Kentucky Derby with Santamaria and his wife a few weeks later.

For the reasons below, McPhail deserves a sentence at the low end of the applicable Guideline range, here 51 months.

- McPhail *himself* instigated the insider trading scheme. He did it by email on July 9, 2009, when he suggested that seven of his friends, "Try this one … AMSC … watch it July 30th." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A).

- The scheme involved not one tip, but several tips over a nearly two year period, interspersed with near constant email discussion among the co-conspirators. *Id*.; see Application Note 1 to U.S.S.G. § 2B1.4 (setting forth a non-exhaustive list of the characteristics of "an organized scheme to engage in insider trading," nearly all of which were implicated by McPhail and his co-conspirators' conduct).

- McPhail was the narrow point of the funnel. That is, he knowingly enabled illicit trading by willfully distributing inside information to *seven* people, with the intent that they profit from the information he provided. Overall, his actions led to more than $746,000 in illegal gains and avoided losses – a significant sum. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A).

- McPhail knew that each tip was a conscious, willful betrayal of the trust Santamaria, wisely or not, had placed in him. From July 2009 through April 2011 and beyond, McPhail manipulated Santamaria by misusing what Santamaria told him without ever telling Santamaria what he was doing. *Id*.

- McPhail, far from taking responsibility for his actions, instead chose to take the stand and lie.

Moreover, McPhail's actions require a sentence that promotes both general and specific deterrence. There is a reason why this case has garnered moderate press attention: the underlying factual scenario – tips among fellow members at a country club – is an insider trading cliché. And it is a cliché precisely because it is common. Insider trading, especially outside the closely regulated confines of securities professionals, is

easy to commit but hard to uncover and prove.  *See* 18 U.S.C. § 3553(a)(2)(A-B).  Because of the limited number of insider trading prosecutions relative to the incidence of insider trading, deterring others should be a primary consideration when sentencing a convicted defendant.  The Guideline Sentencing Range takes such deterrence into account.

As to specific deterrence, McPhail is unlike any of his tippees.  While the tippees obtained material, non-pubic information through the happenstance of knowing McPhail, McPhail willfully manipulated someone who thought of him as a close friend.  Instead of loyalty, McPhail chose deception and betrayal, with the goal of impressing his buddies and reaping the benefits that would provide.  *See* 18 U.S.C. § 3553(a)(2)(A, C).

Finally, a Guideline sentence is necessary in this case because every insider trading transaction has a nameless victim on its other side.  Parigian, Meadows, and Brown's made improbable (but rigged) market bets on AMSC and got themselves six-figure pay days.  But there were traders on the other side of those bets who suffered six-figure losses and never suspected that they had been had.  A Guidelines sentence here protects the trading public and promotes respect for the securities laws.  See Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv. L. Rev. 322, 356 (1979) ("If the market is thought to be systematically populated with ... transactors [trading on the basis of misappropriated information] some investors will refrain from dealing altogether, and others will incur costs to avoid dealing with such transactors or corruptly to overcome their unerodable informational advantages").

Certain other arguments raised in the context of McPhail's sentencing are addressed below.

## Argument

I. **The PSR Correctly Calculates McPhail's Guidelines Sentencing Range, Including an Enhancement for Obstruction of Justice**

McPhail's Guideline calculation is not complex: starting with a base offense level of eight (¶ 37), the Probation Office added 14 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(H), for an amount of illicit gain/avoided loss based on evidence admitted at trial (¶ 38). Probation then added an additional two levels for obstruction, pursuant to U.S.S.G. § 3C1.1, because McPhail willfully impeded the administration of justice by lying under oath (¶ 43). The total offense level is 24, which corresponds at Criminal History Category I to an advisory Guideline Sentencing Range of 51 to 63 months.

### A. McPhail Deserves the Obstruction Enhancement

The Probation Department was correct to impose the obstruction enhancement.[3] As detailed in the PSR (¶¶ 27-30), the evidence shows, certainly by more than a preponderance, that McPhail lied under oath. Section 3C1.1 of the Guidelines includes "committing … perjury" and "providing materially false information to a judge or magistrate judge" as examples of conduct warranting an obstruction enhancement. Application Notes 4(B) & (F). "To impose an obstruction of justice enhancement premised on perjury, a sentencing court must make an independent finding that the elements of perjury have been satisfied." *United States v. Shinderman*, 515 F.3d 5, 19 (1st Cir. 2008). A defendant who makes false statements, under oath, about a matter material to the proceedings has committed perjury "if the false statements

---

[3] A copy of McPhail's trial testimony accompanies this memorandum as Exhibit A.

are not the result of confusion, mistake or faulty memory, but rather the willful intention to provide false information." *United States v. Fermin*, 771 F.3d 71, 81 (1st Cir. 2014); *see also, e.g., United States v. Dunnigan*, 507 U.S. 87, 92-94 (1993).[4]

The government concedes that the mere fact that the jury implicitly rejected McPhail's version of events by finding him guilty is not enough to find that he obstructed justice from the witness stand. *See, e.g., United States v. Gobbi*, 471 F.3d 302, 314 (1st Cir. 2006) ("It is, of course, improper to impose such an enhancement mechanically, merely because an evidentiary conflict exists, or because the jury rejects the defendant's explanation of the facts and finds him guilty.").

But courts do uphold the enhancement when a defendant's testimony is contradicted *by evidence in the trial record*. *See id.* (upholding enhancement where district court held that "it had discerned a stark contradiction between Gobbi's trial testimony and the reality of the related events," and that "Gobbi's wholesale denial of any involvement in the conspiracy . . . constituted a web of lies"). All that is required is that the sentencing court "independently find by a fair preponderance of the evidence that the defendant deliberately lied about a material matter." *United States v. Maguire*, 752 F.3d 1, 5-6 (1st Cir. 2014) (affirming obstruction enhancement where defendant's testimony was contradicted by four other witnesses).[5]

---

[4] The "materiality" requirement for perjury is broadly construed. *See United States v. Scivola*, 766 F.2d 37, 44 (1st Cir. 1985) (making this point). False statements are material if they have "a natural tendency to influence" or are "capable of influencing the decision of the decision-making body" to which they are addressed. *Kungys v. United States*, 48 U.S. 759, 770 (1988) (internal quotation marks omitted). The subject of the misrepresentation may be material to "any proper matter of the jury's inquiry, including the issue of credibility." *United States v. Burke*, 1986 WL 14092 (D. Mass. Nov. 26, 1986) (citing *Scivola*, 766 F.2d at 44).

[5] *See also United States v. Alicea-Rios*, No. CRIM. 06-0178CCC, 2009 WL 3747164, *6 (D.P.R. Nov. 4, 2009) (imposing enhancement where defendant's "categorical" denial that he gave preferential

So it is here. When he testified, McPhail did not fall victim to "confusion, mistake, or faulty memory." McPhail claimed on direct examination that he simply didn't know that the information Santamaria gave him was nonpublic, but in numerous emails McPhail referred to "inside information," to AMSC announcements planned for days later and, in one instance, to AMSC information that "probably will not be released to the public for a while, if ever." *PSR* ¶ 28(e) (McPhail email of March 1, 2010). Similarly, McPhail testified that he had no idea he was supposed to keep the AMSC information to himself, but in email from July 2009 he bluntly responded to his friends' inquiries about AMSC with, "I am not allowed to say … trust me if you want." *Id*. ¶ 29(a).

McPhail also asserted on direct examination that he was unsophisticated about stock trading, to the point where he would not even know how to sell a share.[6] But once again the email evidence contradicted his testimony, including McPhail's September 30, 2009 e-mail in which adeptly valued call and put options and easily communicated in jargon specific to that form of investing: "Look at these friggin options! The November 40's were trading at .55 yesterday. They are up .74 today to $1.29 … 135%!!!! WTF!!!!! The October calls are up 200-300%!" (¶ 27). McPhail was not confused on the stand – he tried to dupe the jury into believing that his tippees knew more than he did.

### B.   McPhail Does not Deserve a Reduction for "Accepting Responsibility"

In his objections to the PSR, McPhail argues that he is entitled to a two-level reduction for acceptance of responsibility because before trial he invited the government to stipulate away

---

treatment was "completely at odds with the declarations of all the government witnesses," and so was more than a "mere denial of guilt").

[6] "I guess investigate, research, see if it's something that interests them. I don't know what you do when you're ready to buy a stock, so I wouldn't really know." *Trans. (I)* at 46; *see also id*. at 61 (cross examination).

most of its case. *See Obj. to PSR* at 9-10. McPhail characterizes this as "continually admit[ing] doing the acts upon which the insider trading charge was based," except, of course, for admitting willfulness. *Id*. at 10.

There are a few problems with this. First, admitting facts the government will prove anyway, but contesting facts that render McPhail guilty of the offense, is not accepting responsibility. *See, e.g., United States v. Melendez*, 775 F.3d 50, 60 (1st Cir. 2014) (affirming denial of reduction where defendant contested drug weight, "which was 'the core of the case'"); *see also, e.g.*, *United States v. DeLeon Ruiz*, 47 F.3d 452, 455 (1st Cir. 1995). Application Note 2 to U.S.S.G. § 3E1.1 says that the "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial *by denying the essential factual elements of guilt*, is convicted, and only then admits guilt and expresses remorse" (emphasis added). While in "rare situations" a defendant who goes to trial "may clearly demonstrate" acceptance, those are only situations in which the defendant "goes to trial to assert and preserve issues that *do not relate to factual guilt*." *Id*. (emphasis added); *see also DeLeon Ruiz*, 47 F.3d at 455 (same).

Contesting intent is contesting "factual guilt." For example, in *United States v. Mikutowicz*, a tax case, the defendant admitted every aspect of the underlying conduct (setting up offshore accounts, not paying taxes on diverted funds, etc.) but denied that he acted willfully. *See* 365 F.3d 65, 75-78 (1st Cir. 2004). On that basis, the district court awarded him a two-level reduction for accepting responsibility. The First Circuit promptly reversed, holding that, "[b]y contesting willfulness, Mikutowicz did not admit 'the essential factual elements of guilt' … That

the defendant possesses the requisite *mens rea* is one of the 'essential factual elements of guilt.'" *Id*. at 76. This holding is consistent across circuits.[7]

Second, at trial McPhail in fact contested quite a bit, including whether he had a relationship of trust and confidence with Santamaria; whether he knew that Santamaria's information was nonpublic; and whether he knew that he was not supposed to tell others. This is not accepting responsibility.

McPhail also argues that he was prompted to go to trial because the *Newman* decision "vitiated the possibility of the facts to constitute a crime." *Obj. to PSR* at 10. But that is simply an opaque way of saying that he went to trial because he thought he might win if he could convince the Court to adopt *Newman*'s more restrictive definition of "benefit." That's not accepting responsibility, that's taking a gamble – something McPhail is prone to do.

## II.  General Deterrence is a Real and Necessary Basis for Sentencing in This Case

By statute, the Court must consider the need for McPhail's sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1)(B). This factor is especially important

---

[7] The *Mikutowicz* court cited *United States v. Crass*, 50 F.3d 81, 84 (1st Cir.1995) ("intent, like any other essential element of the crime charged, may not be contested without jeopardizing a downward adjustment for acceptance of responsibility"); and *United States v. Burrows*, 36 F.3d 875, 883 (9th Cir.1994) (stating that defendant was not entitled to acceptance of responsibility deduction because 'the fact that [he] freely admitted the *actus reus* of the crime does not change the fact that he maintained ... a complete defense based on his purported lack of *mens rea*."). *See also, e.g., United States v. Bennett*, 37 F.3d 687, 696–98 (1st Cir. 1994) (reversing reduction for defendant who went to trial to challenge intent prong of bank fraud charge because defendant had not admitted "factual guilt"); *United States v. Dyck*, 334 F.3d 736, 744 (8th Cir. 2003) (reversing reduction for defendant who went to trial to claim that his conduct was not "willful" because this "was a denial of factual guilt that put the government to its proof"); *United States v. Chastain*, 84 F.3d 321, 324 (9th Cir.1996) (reversing reduction because defendant's "failure to accept responsibility for his crime was manifest in his decision to take the case to trial, where he vigorously denied the 'willful' element of the offense"); *United States v. Jaynes*, 75 F.3d 1493, 1508 (10th Cir.1996) ("Where a defendant admits his conduct but claims he did nothing illegal and had no unlawful intent ... his denial is inconsistent with an acceptance of responsibility.") (internal quotations and citations omitted); *United States v. Castner*, 50 F.3d 1267, 1279–80 (4th Cir.1995) ("[B]y denying intent to defraud [the defendant] did not completely accept responsibility for all his criminal conduct.").

in insider trading cases in the nonprofessional context. While securities professionals – fund managers, brokers, etc. – are already directly regulated by the U.S. Securities & Exchange Commission ("SEC") and self-regulating organizations (*e.g.*, FINRA and the various exchanges), nonprofessionals like McPhail are under no such supervision. Moreover, insider trading in private venues like country clubs is common and extremely difficult to prevent. There is no way to police these kinds of interactions between individuals, especially where those individuals can now easily trade over the Internet without recruiting a live broker.

So, where the government does successfully prosecute a case of this kind, sentencing should reflect the need to deter the many others who might otherwise engage in this kind of misconduct, because the likely alternative is that they simply do not get caught. Increased – publicized – prosecution of insider trading *does* result in less insider trading. That is, general deterrence *works*. *See, e.g., Del Guercio, D.*, et al., *The Deterrence Effect of SEC Enforcement Intensity on Illegal Insider Trading* (Sept. 2013), *avail. at* http://corpgov.law.harvard.edu/2013/07/19/the-deterrence-effect-of-sec-enforcement-intensity-on-illegal-insider-trading/ (abstract and link to full article; statistical analysis finding correlation between deterrence and intensity of SEC enforcement); *Gider, J., Do SEC Detections Deter Insider Trading? Evidence from Earnings Announcements* (Dec. 2013), *avail. at* http://econstor.eu/bitstream/10419/100343/1/VfS_2014_pid_430.pdf (analyzing sample of 398 earnings announcements in which SEC detected insider trading activity; finding deterrent effect on future trading).

In short, beyond McPhail's commission of a willful, long-running fraud in which his buddies made nearly a million dollars, the public interest militates in favor of deterring not only McPhail, but the countless others nationwide who find themselves in a similar position. *See*

*United States v. Politano*, 522 F.3d 69, 73-75 (1st Cir. 2008) (affirming sentence predicated on need for general deterrence; "[g]eneral deterrence is about preventing criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant").

### III. The Government's Recommendation is Proportional to the Sanctions Sought Against Other Participants in the Scheme

From the outset of this case, McPhail and Parigian have accused the government of acting arbitrarily or in bad faith by indicting them and not others. In fact, McPhail and Parigian were among the most culpable targets overall, and were the only two of those targets whose guilt the government believed it could prove beyond a reasonable doubt.

During its investigation, after identifying various potential targets (that is, McPhail and his seven tippees) and the profits/avoided losses attributable to each tippee, the government determined who to indict by passing those targets through two filters: (a) who was culpable enough to warrant indictment, and (b) what could the government prove.

As to the first filter, pursuant to the *Principles of Federal Prosecution* (§ 9-27.250) the government considered whether, as to each person, there were "adequate, non-criminal alternatives to prosecution," like civil enforcement by the SEC. The amount of illicit gain/avoided loss by a tippee was a significant factor in that decision, a factor that, among others, led the government to decline to prosecute John Drohen, Douglas Clapp, Andrew Drohen, John Gilmartin and David Cancian, especially in light of their civil settlements with the SEC. As part of those settlements, each tippee was required to disgorge his trading profits and pay a penalty of equal amount.

As to the remaining tippees, David Brown ($180,907), Jamie Meadows ($191,521), and Douglas Parigian ($301,341), the government charged only Parigian, because he was the only

12

one of those three men who participated in McPhail's tipping email chains, and so the only one against whom the government could prove its case at that time. Suspiciously timely trading, even by someone who knew, or was related to, an insider or misappropriator, is not ordinarily sufficient to prove insider trading.

At Parigian's sentencing, the government sought for him 24 months of incarceration, a proportional term for a tippee who (a) actively participated in a nearly two-year run of insider trading; (b) netted about $300,000; (c) because of his profession, should have known better; and (d) lied to the FBI about why he traded in AMSC when he did.

As the government noted at Parigian's sentencing, McPhail is more culpable than Parigian or any of the other tippees. To be sure, McPhail did not himself trade, but tippers rarely do. And while McPhail did not work for AMSC,[8] misappropriation liability for insider trading treats him as if he had. McPhail conceived of this scheme; facilitated every illegal trade of every one of its participants; and was the only defendant or target who repeatedly breached a duty of trust and confidence to a close friend. And he compounded his crime by lying under oath. The advisory Guidelines Sentencing Range accounts for each of these factors.

---

[8] In a separate strain of its investigation of insider trading on AMSC stock, the government also prosecuted Joseph Tocci, an assistant treasurer at AMSC who used inside information to trade on his own account in early April 2011. *See United States v. Joseph Tocci*, No. 13-CR-10239-RWZ. Tocci pleaded guilty pre-indictment to one count of securities fraud and was sentenced to probation. Competing factors impacted Tocci's case: on the one hand, he was an insider; on the other, he engaged in a single illicit trade that netted him only $80,000, did not deceive or betray any other person, and he did not tip anyone else.

**Conclusion**

For the foregoing reasons, McPhail should be sentenced to 51 months in prison, followed by three years of supervised release. The government does not seek forfeiture.

Respectfully submitted,

Carmen M. Ortiz
United States Attorney


By:     /s/ *Andrew Lelling*
        Andrew E. Lelling
        Seth B. Kosto
        Assistant U.S. Attorneys

Date:   September 11, 2015

## Certificate of Service

  I hereby certify that, on the above date, this document will be filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

              /s/ *Andrew Lelling*
              Andrew E. Lelling
              Assistant U.S. Attorney