UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |  |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | | |
| v. | ) ) ) | No. | 14-CR-10201-DJC |
| **ERIC MCPHAIL** | ) ) | | |

### ERIC McPHAIL'S SENTENCING MEMORANDUM

The principal rationale for the creation of the United States Sentencing Guidelines (USSG) was to obviate the existence of the unfair practice analogously expressed by the proverb – "making fish of one and fowl of another."[1]  McPhail proffers this proverb because he anticipates the Court will sentence him differently, and more harshly, than the sentence imposed on Douglas Parigian.  This concern emanates from the events that took place at Parigian's sentencing.  After Parigian, a criminal attorney who addresses courts regularly, made an impassioned speech in which he expressed contrition and stated that he accepted responsibility and blame for his behavior, the Court, *sua sponte*, asked whether the government considered McPhail more culpable than Parigian. The government responded in the affirmative and after considerable deliberation, the Court adopted the recommendation of Parigian's lawyer and sentenced him to time served – the one day he and McPhail were in the holding cell awaiting their initial appearances before the Magistrate.

---

[1] "make fish of one and flesh of another" means to favor one thing or person over another, to make unfair distinctions between similar things or persons; also to make fish of one and fowl of another. The allusion is to the practice of dividing meat into the categories of fish, flesh, and fowl. Thus, to make fish of one and flesh or fowl of another is to discriminate unnecessarily and unfairly between basically similar things or persons, to show partiality. http://www.thefreedictionary.com/favoritism, last checked September 16, 2015.

I.  **ERIC MCPHAIL SHOULD RECEIVE THE SAME SENTENCE AS HIS CO-CONSPIRATOR DOUGLAS PARIGIAN.**

In this matter, Eric McPhail (McPhail) was indicted along with Douglas Parigian and charged with conspiracy to commit securities fraud and a substantive charge of securities fraud (insider trading). McPhail, a stone and granite salesman, obtained confidential information from Angelo Santamaria about AMSC – the insider – and relayed the information to his golfing buddies, Parigian and others via emails. Paragian and the others were all friends and communicated daily on the same email chain -- exchanging banter and other information. Virtually everyone on the chain traded on the information provided by McPhail and each of the people understood that the others were trading – discussing their trades openly, and often. Some made small amounts of money and others, like Parigian, made a lot of money. McPhail did not trade and the benefit he was alleged to have obtained was *pinot noir,* a steak dinner and (maybe) a massage.

The government offered evidence of two other persons who traded, but candidly acknowledged that "McPhail and Parigian were among the most culpable targets overall, and were the only two of those targets whose guilt the government believed it could prove beyond a reasonable doubt." With respect to David Brown and Jamie Meadows the government admitted that "[s]uspiciously timely trading, even by someone who knew, or was related to, an insider or misappropriator, is not ordinarily sufficient to prove insider trading." See *Government's Sentencing Memorandum*. Thus, excising Brown and Meadows from the conspiratorial equation, the conspiracy alleged against McPhail involved the same individuals and the same amount of money as that alleged against Parigian. Pursuant to USSG § 1B1.3(a)(1)(B), as conspirators, the granite salesman and the lawyer, would each be responsible for the same amount of loss and be equally culpable. See *United States v. Savarese*, 686 F.3d 1, 17-18 (1st Cir. 2012) ("Generally, in

identifying relevant conduct under the sentencing guidelines, a defendant engaging in jointly undertaken criminal activity is accountable for all reasonably foreseeable acts performed in furtherance of that activity. U.S.S.G. § 1B1.3."); *United States v. Ortiz*, 560 F. App'x 894, 898 (11th Cir.) *cert. denied*, 135 S. Ct. 296 (2014).

In its Sentencing Memorandum, the government, seeking to distinguish McPhail from Parigian, addresses McPhail's Objections to the PSR, asserting that McPhail should be sentenced differently because he was more culpable since (1) he testified falsely and thereby obstructed justice, (2) did not accept responsibility, and (3) "the government's recommendation is proportional to the sanctions sought against other participants in the scheme" See *Government's Sentencing Memorandum*.

None of these three alleged distinctions should alter McPhail's request to receive the same sentence as his co-conspirator Parigian, regardless of the sanction sought, but not imposed, on Parigian

## II. McPHAIL DID NOT TESTIFY FALSELY – THEREFORE, THE TWO LEVEL ENHANCEMENT FOR OBSTRUCTION OF JUSTICE IS INAPPLICABLE.

In ¶32 of the PSR, the Probation Officer indicated that Eric McPhail should receive a two (2) level enhancement because "[t]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when [he] committed perjury and misstated material facts during his testimony at trial." The Probation Officer cited ¶s 27-30 in support of her conclusion that McPhail committed perjury when he testified at trial. With regard to *misstating facts*, the Report states that "McPhail claimed more than once that he was unsophisticated about securities trading, including not even knowing what to do to sell a stock." *PSR* ¶27. With respect to perjury, the Report lists three basic catagories of statements claimed to be perjurious: (1) McPhail asserted that he did not know that the information Santamaria

gave him was nonpublic; (2) McPhail testified that he had no idea that he was expected to keep the AMSC information to himself; and, (3) McPhail claimed that Santamaria was merely one of "hundreds" of casual friends, as opposed to someone with whom McPhail had an especially close relationship and similarly, that he did not receive, and in no way expected, any kind of benefit for tipping his friends.

Section 3C1.1 of the Guidelines requires willful obstruction of justice. According to its Application Note 4(B), committing perjury is an example of the conduct covered by the rule. In *United States v. Dunnigan*, 507 U.S. 87 (1993), the Court reversed the Fourth Circuit's determination that the guideline was unconstitutional when applied to trial testimony because it impermissibly burdened a defendant's right to testify. See 994 F. 2d 178, 183-184 (4th Cir. 1991). In doing so, the Supreme Court observed "Of course, not every accused who testifies at trial and is convicted will incur an increased sentence under §3C1.1 for committing perjury. As we have observed,[2] an accused may give inaccurate testimony due to confusion, mistake or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." *Dunnigan*, 507 U.S. at 95.

Respectfully, the defendant submits this case falls into the category of truthful testimony deemed insufficient to prove lack of intent rather than the category of willful falsehoods.

Paragraph 27 revolves around the word "unsophisticated". Support for claiming this to

---

[2] On the prior page of the opinion, the Court defined perjury with reference to the federal perjury statute, 18 U.S.C. §1621 and observed that under it, a witness testifying under oath or affirmation commits perjury by giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Dunnigan*, 507 U.S. at 94 (citations omitted.)

be a misstatement, the report states that the emails showed that McPhail had "familiarity" with certain terms and concepts dealing with the stock market. But, familiarity is not analogous with sophistication. An individual might be familiar with the internet, but that does not mean that she can build her own WWW (World Wide Web).

The same rationale applies to the claimed perjurious statements. Each of the statements identified as perjurious requires a specific state of mind that is totally subjective. For example, McPhail's testimony that he did not know that the information Santamaria gave him was nonpublic is completely dependent on an interpretation of the requirements set out in *Dirks* and *Newman*. Santamaria acknowledged that he frequently talked about AMSC to members at the club in the presence of McPhail and others. Although the information discussed might have been "confidential," the casualness with which it was discussed belies that it was considered nonpublic by the parties involved. Likewise, the last bit of information imparted to McPhail was provided in the presence of several other individuals in a public bar.

In the same context, whether McPhail believed he was expected to keep the AMSC information to himself is totally subjective and required McPhail to arrive at an inference that Santamaria expected him to maintain the confidentiality of the information. Santamaria admitted that he never specifically had an actual agreement with McPhail to keep the information secret, but he assumed that because of their past relationship, McPhail would keep the information to himself. The same reasoning applies to the assertion that McPhail claimed that Santamaria was merely one of "hundreds" of casual friends, as opposed to someone with whom McPhail had an especially close relationship and similarly, that he did not receive, and in no way expected, any kind of benefit for tipping his friends. Santamaria and others observing the interactions between Santamaria and McPhail might infer a close relationship. But, whether McPhail believed the

relationship to be close was completely subjective. McPhail never denied any of the factual underpinnings from which the government urged the jury to infer the relationship was close; he simply testified that HE did not believe that he had a close personal relationship with Santamaria as might be intended by SEC Rule 10b5-2(b)(2). McPhail's testimony that he did not receive a benefit is also subject to the same analysis.

McPhail's position herein is similar to the factual situation in *United States v. Rowe*, 202 F.3d 37, 39-44 (1st Cir. 2000). Rowe was charged with bankruptcy fraud. One aspect of the charges against Rowe concerned his failure to acknowledge his ownership interest in a residence he owned jointly with his former wife. At sentencing, the district court applied a two level enhancement to Rowe's base offense level on the grounds that he had perjured himself at trial. "In the court's view, 'Rowe's [testimonial] denials of an ownership interest in real property located at 20 Highland Avenue, Nahant, Massachusetts, were untruthful and material' and thereby warranted a sentencing enhancement for obstruction of justice." *Rowe, supra*.

On appeal, the government conceded that Rowe admitted at trial that he was an owner of record on the property at all times and that he had omitted this interest from his schedule of assets.

Overturning the enhancement, the First Circuit stated:

> Rowe simply tried to justify why he did what he did by claiming that he did not disclose the house to the bankruptcy court because he felt that the mortgages and attachments had rendered the asset worthless and because in any event, he verbally had agreed to give his share of any proceeds of a sale to his ex-wife if the property ever could be sold. The import of his testimony was that he did not think that he was legally obligated to list a worthless asset in his bankruptcy filings. Although the jury was entitled to disbelieve Rowe's claim that he simply had *44 made a mistake, the mere fact that he tried to explain himself at trial cannot alone support an obstruction of justice enhancement. *See United States v. Akitoye,* 923 F.2d 221, 228 (1st Cir.1991) ("[I]f perjury is less than apparent on the record as a whole, with due respect for the trial judge's coign of vantage and allowing reasonable latitude for credibility assessments, the defendant should be given the

6

benefit of the resultant doubt.")

McPhail's position is on par with Rowe's as his testimony was an explanation of why he did not believe he had committed a crime, especially in light of the recent decision in *Newman*.

In *United States v. Shinderman*, 515 F.3d 5, 8-20 (1st Cir. 2008) the Court noted that perjury consists of false testimony under oath concerning a matter material to the proceeding. Explaining the analysis necessary the *Shinderman* court said that "[t]he sentencing court must find that the testimony is given 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.' *Id*., citing *Dunnigan,* 507 U.S. at 94. Although not dispositive, "[i]t would be improper to impose an obstruction of justice enhancement 'merely ... because the jury rejects the defendant's explanation of the facts and finds him guilty,'" *Shinderman, citing United States v Gobbi,* 471 F.3d at 314. "When all is said and done, an upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1 requires more than a mere conflict in the trial testimony or a jury's rejection of a defendant's alibi or denial of guilt." *United States v. Akitoye*, 923 F.2d 221, 229 (1st Cir. 1991).

    A. **THE GOVERNMENT'S CLAIM THAT MCPHAIL'S LIES DISTINGUISH HIM FROM PARIGIAN IS BELIED BY THE INVESTIGATION AND PROSECUTION OF THIS CASE.**

In the government's view, "[t]he Probation Department was correct to impose the obstruction enhancement." *Government's Sentencing Memorandum*. As it must, the government acknowledged that "the mere fact that the jury implicitly rejected McPhail's version of events by finding him guilty is not enough to find that he obstructed justice from the witness stand." *Id*., citing *United States v. Gobbi*, 471 F.3d 302, 314 (1st Cir. 2006) ("It is, of course, improper to impose such an enhancement mechanically, merely because an evidentiary conflict exists, or because the jury rejects the defendant's explanation of the facts and finds him guilty.").

The factual basis for the government's allegation that McPhail lied when he testified

7

concerned McPhail's claim "that he simply didn't know that the information Santamaria gave him was *nonpublic*." *Id*., (emphasis added).  Evidence of the falsity is asserted by the government to be McPhail's reference in emails to "*inside information*," to AMSC announcements planned for days later and, in one instance, to AMSC information that "probably will not be released to the public for a while, if ever."  The words *nonpublic* and *inside information* are not necessarily synonymous. In relation to securities trading, the concepts are not easily understood – even by experts.  See Robert Steinbuch, *Mere Thieves*, 67 Md. L. Rev. 570, 615 (2008):

> Indeed, Black's Law Dictionary offers the following illustration of the difficulty in defining "insider trading" under the law: "What is insider trading?" The term is probably best defined, to the extent any definition is adequate, as "the purchase or sale of securities on the basis of material, non-public information." What counts as "non-public information"? What non-public information can be deemed "material"? When is a trader who is in possession of material, non-public information trading "on the basis of" that information? Must the information be about the company whose securities are being purchased or sold? What characteristics establish "insider" status sufficient to warrant legal proscriptions of trading? These are all questions that are derived from the definition of insider trading just offered.... Black's Law Dictionary 811 (8th ed. 2004) (quoting Edward Fletcher, Materials on The Law of Insider Trading 3 (1991)).

Similarly, the government alleged that McPhail falsely testified "that he had no idea he was supposed to keep the AMSC information to himself" and that he was unsophisticated regarding trading.  *Government's Sentencing Memorandum*.  Regarding the email that says "I am not allowed to say" is in response to a question of *who* provided the information not that he knew that he could not further relay the information.

These alleged lies are one of the reasons McPhail is claimed to be more culpable than Paragian who pled guilty and expressed contrition at the sentencing hearing.  Such a conclusion is also based on a faulty recapitulation of the history of this case.  <u>Parigian</u> [not McPhail] was actually charged by the grand jury pursuant to 18 U.S.C. §1001 with lying to the investigators.

8

Parigian's lie was obvious and indefensible. Perhaps for that reason, Parigian negotiated a plea agreement that would dismiss the §1001 charge (which would still be relevant conduct) and plead to the security charges. There is no distinction adverse to McPhail in light of the §1001 charge. But, in reality McPhail, not Parigian, made the government's case at its outset.

### III. McPHAIL SHOULD ACTUALLY BE GIVEN A TWO-LEVEL REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.

USSG § 3E1.1(a), allows a reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense." See *United States v. Landron-Class*, 696 F.3d 62, 76 (1st Cir. 2012). Proceeding to trial rather than pleading guilty only creates a *rebuttable* presumption *United States v. Melendez*, 775 F.3d 50, 59-60 (1st Cir. 2014) cert. denied, 135 S. Ct. 2826 (2015), and the sentencing court can still give the benefit of the reduction if the defendant "clearly demonstrates acceptance of responsibility for his offense." *Id*. The *Melendez* Court indicated that "[t]o prove acceptance of responsibility, a defendant must truthfully admit or not falsely deny the *conduct* comprising the conviction, … " *Id*., citing *United States v. Garrasteguy,* 559 F.3d 34, 38 (1st Cir.2009). In *Garrasteguy*, the Court said that the burden is on the defendant to establish his eligibility for a decrease in the offense level. The *Garrasteguy* court acknowledged that if a defendant proceeds to trial, he greatly diminishes his chances of receiving a reduction; "proceeding to trial creates a *rebuttable* presumption that no credit is available." *Garrasteguy* at 38–39.

In *United States v. Landron-Class*, supra, the defendant argued that he fully accepted responsibility for his offense, pointing out that he detailed his role in the scheme in a series of interviews with authorities and even offered to cooperate in the investigation of others. The defendant claimed that he went to trial instead of pleading "because he felt he was being treated unfairly as compared to others convicted in the same scheme, all of whom were offered deals

9

calling for a shorter period of incarceration." *Id*. He argued that insisting on going to trial under these circumstances is not incompatible with the type of acceptance of responsibility called for by USSG § 3E1.1(a). In *United States v. Landron-Class* the court acknowledged that the guidelines provide that in "rare situations" the reduction may be available to those who go to trial. Id., citing USSG § 3E1.1 cmt. n.2. Quoting from cmt. n. 2, the court provided "for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*

McPhail's case constitutes one of the "rare situations" in which going to trial is compatible with a § 3E1.1(a) reduction. McPhail continually admitted doing the acts upon which the insider trading charge was based, but claimed that the *mens rea* that could be inferred by employing SEC Rule10b5-2(b)(2) was constitutionally infirm and that the recent Second Circuit ruling in *Newman* concerning "benefit" vitiated the possibility of the facts to constitute a crime.

McPhail told the trial court that there was no significant factual dispute between the parties and that the case would be resolved (one way or another) when the *Newman* case was ultimately decided and asked that the trial be continued until that decision was rendered. The trial court denied the continuance. McPhail had no choice but to go to trial to preserve his constitutional rights.

Therefore, he should receive a two point reduction in the guideline calculation.

### A. THE GOVERNMENT'S RESPONSE TO MCPHAIL'S REQUEST FOR A REDUCTION FOR "ACCEPTING RESPONSIBILITY"

The Government argued that:

[A]dmitting facts the government will prove anyway, but contesting facts that render McPhail guilty of the offense, is not accepting responsibility. See, e.g., *United States v. Melendez*, 775 F.3d 50, 60 (1st Cir. 2014) (affirming denial of

reduction where defendant contested drug weight, "which was 'the core of the case'"); see also, e.g., *United States v. DeLeon Ruiz*, 47 F.3d 452, 455 (1st Cir. 1995). Application Note 2 to U.S.S.G. § 3E1.1 says that the "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse" (emphasis added). While in "rare situations" a defendant who goes to trial "may clearly demonstrate" acceptance, those are only situations in which the defendant "goes to trial to assert and preserve issues that do not relate to factual guilt." *Id*. (emphasis added); see also DeLeon Ruiz, 47 F.3d at 455 (same).

The basis for the position that McPhail did not accept responsibility, according to the Government is that "[c]ontesting intent is contesting factual guilt.'" *Government's Sentencing Memorandum.* Citing *United States v. Mikutowicz*, 365 F.3d 65, 75-78 (1st Cir. 2004), who admitted every aspect of the underlying conduct (setting up offshore accounts, not paying taxes on diverted funds, etc.) but denied that he acted willfully was not eligible for the "acceptance" reduction. Quoting from *Mikutowicz* as its basis, the Government stated that "[t]he First Circuit promptly reversed [Mikutowicz' sentence], holding that, '[b]y contesting willfulness, Mikutowicz did not admit 'the essential factual elements of guilt' … That the defendant possesses the requisite *mens rea* is one of the 'essential factual elements of guilt.'" *Mikutowicz,* at 76.

Snidely remarking that McPhail's argument that he went to trial because of the *Newman* decision was "simply an opaque way of saying that he went to trial because he thought he might win if he could convince the Court to adopt *Newman's* more restrictive definition of 'benefit.'" The Government concluded "[t]hat's not accepting responsibility, that's taking a gamble – something McPhail is prone to do."

Presenting this argument as a counter-point to explain why McPhail's sentence should be harsher than Parigian, the Government fails to mention that Paragian, just as McPhail, also did not acknowledge that he possessed the requisite *mens rea* to commit the security fraud charged in

11

the Indictment. Paragian also asserted that if he were right with regard to the holding in *Newman*, he would be vindicated and specifically reserved his right to appeal. Within days after he was sentenced by this Court, Parigian appealed his conviction.

### IV.    McPHAIL SAYS THE SENTENCE GIVEN TO HIS CO-DEFENDANT WARRANTS A SIMILAR NON-GUIDLINE SENTENCE FOR HIM.

In accordance with 18 U.S.C. § 3553(A)(6), the trial court should avoid disparity between the sentence given to McPhail and his co-defendant. Since passage of the Sentence Reform Act of 1984 (SRA), 18 U.S.C. § 3553(a)(6) ("(a)(6)") has required sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (2000). Although the government has indicated that McPhail had a greater involvement in the criminal acts, both he and his co-defendant were convicted of the same crimes. Thus, the term "found guilty," raises important problems. In common usage, defendants are "found guilty" of crimes, not conduct. What, then, is the unit of analysis: defendants convicted of similar crimes or defendants who have engaged in similar conduct? The defendant McPhail submits that "similar crimes" is the proper standard for application of § 3553(a)(6). See Michael M. O'Hear, *The Duty to Avoid Disparity: Implementing 18 U.S.C. S 3553(a)(6) After Booker,* 37 McGeorge L. Rev. 627, 628-48 (2006). Therefore, McPhail should be sentenced similar to Parigian.

### V.    PROLOGUE

One incident that occurred during the long and grueling investigation of this case bears further examination as an example of McPhail's acceptance of responsibility and contrition -- McPhail offered and was given the opportunity to make a proffer in this case. The proffer occurred after Santamaria had been interviewed telephonically by the SEC but before the agents spoke to him. The focus during Santamaria's SEC interview was what he might have told others

concerning the impending Sinovel contract cancellation.  Santamaria indicated that he did not tell anyone anything.  His recollection was faulty and he failed to tell the SEC investigator that he had sent an email to McPhail and had told McPhail and Cancian of the information at a bar.

During McPhail's proffer the focus of the inquiry was the last trade (after Sinovel indicated it was cancelling) of AMSC stocks.  Towards the end of the proffer, although not specifically asked, McPhail informed the AUSA that Sanatamria had sent him the email explaining the Sinovel problems.  McPhail offered to provide the email – and did.  The email was a revelation to the investigators – was the "smoking gun" and was probably the reason Santamaria agreed to cooperate.  This was the very same email that Santamaria had asked McPhail to destroy.  The granite salesman said NO!

McPhail should receive the same sentence this court gave to Paragian.

Eric McPhail, defendant
By his attorneys,

/s/ *William J. Cintolo*

_____
Thomas R. Kiley, BBO No. 271460
William J. Cintolo, BBO No. 084120
COSGROVE EISENBERG & KILEY
One International Place, Suite 1820
Boston, MA 02110
617.439.7775 (tel) – 617.330.8774 (fax)
WCintolo@CEKLaw.net

Dated: September 16, 2015

### Certificate of Service

I, William J. Cintolo, hereby certify that on this date, September 16, 2015 a copy of the foregoing document has been served via email upon the Assistant U.S. Attorney prosecuting this matter.

/s/ *William J. Cintolo*
William J. Cintolo